Darling & Co. (Inc.) v. United States (No. 2244).[1]

Tankage—Liquid Stick—Packing-House Waste.

 Refuse of meat-packing houses, unfit for human consumption, known as "tankage" or "liquid stick" according to the water content, was imported to be screened, the screened part to be used after further processing and the addition of other ingredients in making fertilizer, and the remainder, after further processing and the addition of other ingredients, to be used as hog feed.   As imported, it was not "used only for manure," and not so classifiable under free paragraph 499, tariff act of 1913.   Under the rule of Willits & Co. v. United States (11 Ct. Cust. Appls. 499; T. D. 39657) it is waste, under paragraph 384, and the judgment of the Board of United States General Appraisers sustaining the collector's classification of it as a nonenumerated manufacture under paragraph 385 is reversed.

United States Court of Customs Appeals, February 9, 1924.

Appeal from Board of United States General Appraisers, Abstract 45589.

[Reversed.]

*J. Arthur Miller* for appellant.
*William W. Hoppin*, Assistant Attorney General (*Charles D. Lawrence* and *John A. Kemp*, special attorneys, of counsel), for the United States.

[Oral argument, December 12, 1923, by Mr. Miller and Mr. Lawrence.]

Before Martin, Presiding Judge, and Smith, Barber, and Bland, Associate Judges; Hatfield, Associate Judge, participating in the decision by agreement of counsel.

Barber, Judge, delivered the opinion of the court:

The merchandise involved in the importation in this case is called "tankage."   The only witness who testified before the Board of General Appraisers was produced by importer.   He referred to it

---

[1] T. D. 40023.

as tankage and liquid stick, said it was called tankage because it was put in tanks and stick because it was sticky, and that there was a little more water in the liquid stick than in the tankage.

As to what in fact the merchandise is and how produced, the witness stated:

In packing houses there is certain parts of the animal, either cattle or hogs, that is not fit for human consumption—fleshings and even old animals, parts of hoofs, sinews, etc. There is a certain amount of fat in these products and packers are anxious to recover all the fat they can. The process is very simple. I can describe it by telling you that it is similar to making a beef stew. They are put in a tank and cooked the same as a stew and the grease is skimmed off the top and the rest of the material is tankage. It is called tankage because it was put in tanks.

He further said in substance that these parts of animals were packing-house refuse; that in the condition imported the merchandise was fit for fertilizer and for no other purpose; and that after importation it was screened out with large screens, the part that went through the screen being used for making hog feed and the remainder for the manufacture of fertilizer. What proportion was made into feed and what into fertilizer does not appear. In making the feed and fertilizer other materials are used, but nothing definite appears in that connection. The witness also said, "If it is used in the condition as imported it is used for fertilizer," but he did not state more definitely that these or similar importations were in fact so used.

The collector assessed the merchandise at 15 per cent ad valorem as a nonenumerated manufactured article under paragraph 385 of the tariff act of 1913. Importer protested, claiming free entry under paragraph 499 of the same act which extends that favor to "all substances used only for manure," also claiming alternatively that if dutiable it fell under the provision "for waste not specially provided for," in paragraph 384.

The Board of General Appraisers overruled the protest.

The basis of importer's contention that it is entitled to free entry under paragraph 499 is that its witness testified without contradiction that as imported it was fit only for use as a fertilizer, that is, as manure, and that if it was used in the condition as imported it was so used.

We agree with the conclusion of the Board of General Appraisers that such facts do not bring it within the provisions of 499. The fact that certainly a substantial part of the merchandise is used in the manufacture of hog feed negatives the conclusion that it is used only for manure.

As to the applicability of paragraph 384 it may be observed that the judgment of the board overruling the protest in this case was entered January 24, 1923. Four months later in the case of Willits & Co. *v.* United States (11 Ct. Cust. Appls. 499; T. D. 39657) this

court determined the classification of merchandise called beef cracklings. It appeared that the refuse of meat-packing houses in South America, consisting of pieces of lungs, hearts, udders, livers, and small scraps of meat not suitable for use as material in the ordinary operations of the packing house but containing a valuable proportion of tallow, were cooked in tanks, the grease skimmed off and the residue subjected to powerful hydraulic pressure for the purpose of recovering as far as possible any remaining grease. The pressure left the residue in compacted cakes, in which condition it took the name of beef cracklings and was imported. After importation it was broken up and ground, usually but not always mixed with other material and sold for chicken feed. After careful consideration we held in an opinion by Martin, Presiding Judge, that such beef cracklings were classifiable as waste under paragraph 384 instead of as a nonenumerated manufactured article under paragraph 385

It is obvious that there is little if any difference between the commodity considered in the Willits case and the tankage here involved. Both importer and the Government recognize that fact, the importer contending that that case is controlling if the merchandise here is not found to be entitled to free entry, the Government arguing that the conclusion we reached in the Willits case was unsound.

It will be noted that paragraph 499 was not invoked in the Willits case. We are satisfied with the conclusion reached in that case and that it rules this.

The judgment of the Board of General Appraisers is *reversed*.