SWIFT & CO. *v.* UNITED STATES (No. 4025) [1]

United States Court of Customs and Patent Appeals, March 1, 1937

*Curtis E. Loehle* for appellant.

*Joseph R. Jackson,* Assistant Attorney General (*Joseph F. Donohue,* special attorney, of counsel), for the United States.

[Oral argument February 9, 1937, by Mr. Loehle and Mr. Donohue]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

Two importations of material denominated as liver meal tankage were made at the port of New Orleans, La., under the Tariff Act of 1930, by the appellant. The merchandise was classified by the collector, in each instance, as a nonenumerated manufactured article, not specially provided for, under paragraph 1558 of said act. The importer protested in each instance, claiming the goods to be dutiable as tankage, and that the same should be free of duty under the provisions of paragraph 1780 of said act. The cases were consolidated for the purposes of trial.

Paragraphs 1558 and 1780 are as follows:

PAR. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of

[1] T. D. 48871.

10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

PAR. 1780. Tankage, fish scrap, fish meal, cod-liver oil cake, and cod-liver oil cake meal, all the foregoing unfit for human consumption.

A chemist's analysis of the imported merchandise was made and introduced in evidence. The analysis was as follows:

REPORT

Tankage:

| | |
|---|---|
| Moisture | 8. 25% |
| Ammonia | 13. 00% |
| Protein | 66. 82% |

Several witnesses were called on behalf of the importer, and testified as to the character and uses of the imported merchandise. A record in protest 502647–G was also introduced in evidence and incorporated into the record. The latter case concerned merchandise of the same kind.

The United States Customs Court was of the opinion that the merchandise, as imported, was not within the common meaning of the term "tankage", but was a waste which had been ground and subjected to a manufacturing process, and that the merchandise was, therefore, properly classified by the collector as a nonenumerated manufactured product. From that judgment the importer has appealed to this court.

The evidence in the record shows that the imported material is made in the Argentine from packing house wastes, and that the materials which are used in making the same are the lungs of animals, cattle "melts", and condemned beef, sheep, and hog livers, all of which materials were unfit for human consumption. It appears that many of the livers of these slaughtered animals are infected with flukes and cysts. When the lungs, "melts", and livers in question are removed from the slaughtered animals, they are thrown into tanks or kettles where they are cooked under steam pressure or with dry heat. After having been thoroughly cooked, the product thus obtained is dried and is ground into a powdered form. This material is then sacked and exported. It appears that this particular material of which the imported goods are made, is not cooked for the purpose of obtaining fats or oils, as there is comparatively little or no such fats or oils contained in the parts thus cooked. All that is put into the cooking tanks is removed, dried, and ground, and is contained within the imported material. As imported, it is sold and chiefly used for feed for hogs and poultry. The record shows that it might be used for fertilizer, but fails to show that any considerable portion of it is used for any such purpose.

The witnesses for the importer testified that it was known as "tankage" or as "liver meal tankage." No contention was made by

counsel in the court below or here, that any commercial designation of this material as "tankage" had been established. Counsel stated in the trial court:

Mr. LOEHLE. I am not trying to prove commercial designation at all. I just want to know how he knows it according to his observation and experience.

The witnesses for the importer detailed the various varieties of tankage which might be obtained from slaughter house refuse, and expressed their opinions that the imported material was tankage.

The only question involved in this case is whether the imported goods should be classified as nonenumerated manufactured products, as found by the collector and by the court below, or as "tankage * * * unfit for human consumption," as claimed by the importer.

As there is no contention in the case that commercial designation has been established, the case must rest upon the common meaning to be given to the statutory term "tankage." The witnesses for the importer have expressed their opinions that the imported merchandise is "tankage." However, such testimony is advisory only, and the judgment of the court will not be controlled by such testimony if it feels that the opinions of the witnesses as to such common meaning do not express the true meaning of the word. Usually the common meaning of an English word used in the statute is best given by reference to the standard lexicographers. We have, therefore, had recourse to the dictionaries usually consulted, and find the word "tankage" defined as follows:

Webster's New International Dictionary, 1932:

*tankage* 3. *Agric.* Waste matter from tanks; esp., the dried nitrogenous residue from tanks in which fat has been rendered, used as a fertilizer and feeding stuff.

Funk & Wagnalls New Standard Dictionary, 1931:

*tankage* 4. The residuum obtained in rendering refuse fats, etc.: used, when dried, as a fertilizer or as a coarse food.

Oxford Dictionary:

*tankage* 3. The residue from tanks in which fat, etc. has been rendered, used as a coarse food, and as manure.

It seems, therefore, from these authorities, that "tankage," as commonly understood, is a residue obtained from meat products after fats or other materials have been rendered from such products. When such product has been imported into this country without change, we have directed it to be classified as "waste, not specially provided for," in contradistinction to a classification as a nonenumerated manufactured article. *Willits & Co.* v. *United States*, 11 Ct. Cust. Appls. 499, T. D. 39657; *Darling & Co. (Inc.)* v. *United States*, 12 Ct. Cust. Appls. 86, T. D. 40023. When such material was dried and ground,

we considered it to be an article manufactured in whole or in part. *United States* v. *Swift & Co.*, 14 Ct. Cust. Appls. 222, T. D. 41706. *Pacific Guano & Fertilizer Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 218, T. D. 42240.

The material imported, as we have heretofore stated, was not originally a fat producing material. It was submitted to a cooking operation, not for purposes of obtaining fats, or with the result that fats were obtained, but was cooked for the purpose of manufacture into the product which was imported and with the purpose of preparing a poultry and animal feed for exportation and sale. It consisted of lungs, "melts", and livers when it was thrown into the cooking tanks, and when it was removed was nothing more than cooked lungs, "melts", and livers. When it was dried and ground, it was subjected to a manufacturing process. It follows that when it entered this country it was a manufactured product and not being specifically described in the statute was, therefore, properly classified as a nonenumerated manufactured product.

The judgment of the United States Customs Court is *affirmed*.