UNITED STATES v. SWIFT & Co. (No. 2732) [1]

GROUND TANKAGE—WASTE—COMMINGLED GOODS—MANURE—FEED—POLICY OF LAW.

Tankage is waste (par. 1457, Tariff Act of 1922); but there are different grades of it, the higher being chiefly used for feed and the lower for fertilizer. Paragraph 1583, by admitting to free entry "substances used chiefly for fertilizer," intended to benefit the American farmer. To admit to free entry tankage of a grade high enough that its chief use should be in manufacturing feed would not benefit, but harm, him, since it would grant free entry to goods sold in competition with his own produce. The dutiable status of tankage, then, is not to be determined by the use of tankage generally or that of the particular importation, but by that of the particular grade of tankage to which the particular importation belongs. An importation of all grades of

[1] T. D. 41706.

tankage mixed, to be used in combination with a high grade of domestic tankage in the manufacture of stock and poultry feed, is unsegregable commingled goods and dutiable as if it were all of the higher grade. It is not manure, under paragraph 1583; this paragraph expressly distinguishes between "manures" and "other substances chiefly used for fertilizer." Since it has been ground, as a preparation for use in making feed, it has been advanced beyond its former status as waste, under paragraph 1457. Its classification, as assessed, under paragraph 1459, as an unenumerated partly manufactured article not specially provided for, remains.

## United States Court of Customs Appeals, May 29, 1926

APPEAL from Board of United States General Appraisers, G. A. 9081, T. D. 41290

[Reversed.]

*Charles D. Lawrence,* Assistant Attorney General (*John A. Kemp,* special attorney, of counsel), for the United States.
*G. L. De Lacy* for appellees.
*Frank L. Lawrence* (*Martin T. Baldwin* of counsel) *amicus curiae.*

[Oral argument May 14, 1926, by Mr. Charles D. Lawrence]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

The merchandise involved in this appeal is ground "tankage." It was assessed for duty by the collector as a nonenumerated manufactured article, at 20 per centum ad valorem under paragraph 1459 of the Tariff Act of 1922, which reads as follows:

PAR. 1459. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

It was claimed in the protests, as amended, to be free of duty under paragraph 1583 of the Tariff Act of 1922, or dutiable at 10 per centum ad valorem as waste, under paragraph 1457, or at 10 per centum ad valorem as a nonemunerated unmanufactured article under paragraph 1459.

Paragraph 1583 reads as follows:

PAR. 1583. Guano, basic slag, ground or unground, manures, and all other substances used chiefly for fertilizer, not specially provided for: *Provided,* That no article specified by name in Title I shall be free of duty under this paragraph.

Paragraph 1457 provides for "waste, not specially provided for, 10 per centum ad valorem."

It appears from the testimony of the witness, John J. Ferguson, that the merchandise in question was produced in Canada, in the following manner:

These plants are equipped with what are known as steam-pressure tanks. In each of these tanks will be placed varying quantities and proportions of trim-

mings from the carcasses of cattle, sheep, and swine, in the regular course of preparation of these carcasses for human food purposes.  These materials go into one set of tanks, the tanks are closed and steam is applied, and the heat separates the fats and the oils from the meat and the bone material.  *One set of tanks take what they call edible materials from which we get high-grade tankage;* the next set will take a *group of raw materials of a little lower grade* from which you will get a *little lower grade* fats and oils, and *also of the material we call tankage;* and so through varying stages of tanks and *grades of raw materials, we step down* until we get the *group of strictly inedible material* going into the tank, the *odds and ends of the slaughtering,* the viscera, including the lungs and all the various things that make up the machinery of the animal body; *from this* we get low-grade greases and oils such as are used for the manufacture of soap or lubricants; *out of this we get the low-grade tankage.*  So that we have in the packing houses in Canada *different sets of tanks each of which yields a specific kind or grade* of the incident residue known commercially as *tankage.*  In these packing houses they are not as highly organized as the American packing houses, *and the products from these tanks go to the same pile and grouped together and produce what we call tankage, which is, I take it, the tankage that is under consideration at this time.* (Italics ours.)

The witness further testified that the tankage above described, which is the merchandise under consideration here, was ultimately used in the United States during the year 1923, as follows:

30 to 35 per cent for feed purposes and 65 to 75 per cent for fertilizing purposes.

The witness, P. A. Cobb, testified that the merchandise in question, which was imported in the form of meal, was taken from the tanks and dried and "ground to meal."  In this connection the witness said:

\*     \*     \*     \*     \*     \*     \*     \*

Q. Is either the grease or liquid stick left in what you call the tankage?—A. No; it is separated in tanks.  The residue is the solid substance in the tank, and that is the tankage.

Q. Now, this after drying, you say, is in meal form?—A. Yes; it is—well, it is more like meal.  *It is ground fine* of course.  (Italics ours.)

\*     \*     \*     \*     \*     \*     \*

It further appears from the record that the merchandise is unfit for feed in its imported condition; that the importers combine the imported materials with tankage produced in the United States, in the ratio of about 10 per centum of imported to 90 per centum of domestic, and the mixture is manufactured into feed.

Exhibit B consists of copies of reports by the importers' chemist showing a chemical analysis of each of the several importations. These reports were evidently offered for the purpose of showing that the merchandise was not fit for feed in its imported condition.  They do not indicate that there was any great difference in the character of the various importations; on the contrary they rather support the testimony of the witness, Ferguson, that the merchandise consisted of all of the different grades and classes of tankage.

Upon this record the court below held, Judge Adamson dissenting, that the merchandise was entitled to free entry under paragraph 1583.

It is claimed by the Government that the importers failed to prove that the imported merchandise was of a class or kind of tankage which was chiefly used, either in its imported condition or after further processing, as fertilizer; that the evidence conclusively shows that the importations were used exclusively in the manufacture of stock and poultry feed; and that the judgment of the court below was without any evidence to support it.

The appellees contend that they fully established on the trial that the imported merchandise was tankage, and that the chief use of tankage generally was for fertilizer.

From the record in this case it appears that tankage is waste or refuse resulting from the processing of the various parts of animals which are unfit for human consumption, for the purpose of obtaining the fats, oils, and greases therefrom; that there are several (at least three) grades or classes of tankage. What each of these various grades of tankage is chiefly used for does not appear, except that the higher the grade the better it is adapted for use in making stock and poultry feed. Obviously, if the appellees are able, by mixing the imported merchandise, which is a combination of all grades, with a grade of tankage of higher ammonia and protein content, in proportions of 10 per centum of the imported and 90 per centum of the higher grade and from this mixture produce stock and poultry feed all grades of tankage when combined are suitable for use, and are used, in the manufacture of such feed. It is probably true that, by combining the various grades of tankage, the mixture could be manufactured into, and used for, fertilizer.

It is evident, therefore, that the question of the chief commercial use of any one of these grades of tankage ought not to be determined by evidence of the chief use of tankage, generally. Nor ought it to be necessary to inquire into the ultimate use of any particular importation. It seems to us that the precise question to be determined in each case of this character, is: What is the chief use of the particular class of tankage to which the importation belongs? In this connection it must not be forgotten that tankage is not named in paragraph 1583. *United States* v. *Wakem & McLaughlin,* 13 Ct. Cust. Appls. 37, T. D. 40867; *Taylor et al.* v. *United States,* 3 Ct. Cust. Appls. 498, T. D. 33162.

It is plain that the Congress intended by the provisions of paragraph 1583 to encourage the importing of substances which were chiefly used for fertilizing the soil. It is equally plain that it was not intended to permit substances to be imported free of duty under

the provisions of paragraph 1583, which were not of a class which was chiefly used for fertilizer.

The importations involved in this case are composed of all of the various grades and classes of tankage. It is no doubt true that at least one of these grades or classes is chiefly used in this country for fertilizer. It is equally true that at least one grade is chiefly used for making stock and poultry feed.

Ought the importers be permitted to mix the various classes of tankage, one, at least, of which is undoubtedly dutiable under the Tariff Act of 1922, and then, by evidence of the chief use of tankage generally secure the admission of such merchandise free of duty as substances chiefly used for fertilizer? This question seems not difficult to answer, in view of the fact that the appellees use all of the various grades of tankage in combination with a high grade tankage in making feed. The inevitable consequences of a decision favorable to the contention of the appellees, would be the placing of fertilizer manufactured from tankage on the same level as feed. The Congress intended to aid the farmer to secure fertilizer at a low cost; it was plainly not intended by these provisions to bring tankage into competition with farm products.

There was no effort made by the appellee to segregate the imported merchandise, nor is there any claim made in the case that it could have been segregated by the collector in the assessment of duties. The merchandise consisted of different grades and qualities of tankage, commingled. One grade at least was undoubtedly dutiable, and one grade undoubtedly free of duty. They, not being segregable, were subject to duty at the rate applicable to the dutiable grade. *Downing Co.* v. *United States*, 12 Ct. Cust. Appls. 391, T. D. 40582, and cases therein cited.

The appellees contend that the merchandise in its imported condition is manure, and that, therefore, the question of chief use is not necessarily involved in the case. The following definitions of the word "manure" are cited in the brief of *amicus curiae*. We quote therefrom:

Any substance applied to soil to render it more fertile, as dung, decaying animal or vegetable matter, and certain minerals.—Standard (1914).

Any material which fertilizes land; a fertilizing substance.—Webster (1923).

Any substance added to the soil with the view of rendering it more fertile.—Century (1906).

It is unnecessary to discuss this question at any great length. There was no effort made on the trial to show that the merchandise, in its condition as imported, was used as fertilizer, or that it was fit for such use. But, even if it had been shown that, as imported, it was suitable for such use, would that evidence be sufficient to prove that tankage, ground into the form of meal, advanced in condition

for its ultimate use—that of stock and poultry feed—was, after all, nothing but manure? We think not. The Congress has distinguished between manure and substances chiefly used for fertilizer. It probably was not thought by the legislative branch of the Government that manure would have any other important or substantial use than that of fertilizing the soil.

We are of opinion that the merchandise in question is not entitled, for the reasons stated, to free entry under paragraph 1583, as either manure or a substance chiefly used for fertilizer.

It is contended by counsel for the appellee and by *amicus curiae* that, if the merchandise is not free of duty under paragraph 1583, as manure, or as substances used chiefly for fertilizer, it is dutiable at 10 per centum ad valorem as waste, not specially provided for, under paragraph 1457.

This court held in the case of *Darling v. United States*, 12 Ct. Cust. Appls. 86, T. D. 40023, that tankage, which had not been processed in any manner, was dutiable as "waste" under paragraph 384 of the tariff act of 1913. In this case the court followed the decision in the case of *Willits & Co.* v. *United States*, 11 Ct. Cust. Appls. 499, T. D. 39657.

The merchandise in this case has been processed. It has been ground into meal form. The purpose and result of this processing was to advance the merchandise in condition for its ultimate use as feed. It has been partly manufactured. It is true, as contended by *amicus curiae*, that it has not been completely manufactured, nor has it been so far advanced as to entitle it to be classed as a manufacture of tankage. But paragraph 1459 is not limited to manufactured articles or manufactures of articles, not specially provided for. It provides for "articles manufactured, *in whole or in part*, not specially provided for." (Italics ours.)

The record fully establishes that the merchandise was exclusively used by the appellees in the manufacture of stock and poultry feed; that prior to its importation it was dried and ground into the form of meal; that after importation it was again dried and mixed with other materials and made into feed. The collector classified the merchandise as an article "manufactured in whole or in part, not specially provided for," under paragraph 1459. There is nothing in the record to show that the merchandise was not manufactured "in part." On the contrary, we think that it was partly manufactured for its ultimate use—stock feed. *Gallagher & Ascher et al.* v. *United States*, 5 Ct. Cust. Appls. 49, T. D. 34095.

For the reasons stated, the judgment is *reversed*.