UNITED STATES *v.* SPRECKELS CREAMERIES, INC. (No. 3235)[1]

---

[1] T. D. 43835.

United States Court of Customs and Patent Appeals, January 27, 1930.

*Charles D. Lawrence*, Assistant Attorney General (*James R. Ryan*, special attorney, of counsel), for the United States.
*Frank L. Lawrence* (*Martin T. Baldwin* of counsel) for appellee.
*Thomas J. Doherty*, amicus curiae.

[Oral argument December 11, 1929, by Mr. Charles D. Lawrence, Mr. Baldwin, and Mr. Doherty]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GARRETT, Judge, delivered the opinion of the court:

This appeal involves the classification for duty of cylindrical cans, having a capacity of 10 gallons each, made of metal and intended for use in the transportation of milk.

The collector classified them as manufactures of metal under paragraph 399 of the Tariff Act of 1922 and assessed duty at 40 per centum ad valorem.

The importer made protest, claiming them to be admissible free of duty as agricultural implements under paragraph 1504, with an alternative claim under paragraph 328.

The Customs Court held them properly classifiable under paragraph 1504, and the Government has appealed to this court.

The material portions of the involved paragraphs are as follows:

PAR. 399. Articles or wares not specially provided for, * * * composed * * * of metal, * * * whether wholly or partly manufactured, 40 per centum ad valorem.

PAR. 1504. Agricultural implements: Plows, tooth or disk harrows, headers, harvesters, reapers, agricultural drills and planters, mowers, horserakes, cultivators, thrashing machines, cotton gins, machinery for use in the manufacture of sugar, wagons and carts, cream separators valued at not more than $50 each, and all other agricultural implements of any kind or description, not specially provided for, whether in whole or in parts, including repair parts: *Provided*, That no article specified by name in Title I shall be free of duty under this paragraph.

PAR. 328. Cylindrical and tubular tanks or vessels, for holding gas, liquids, or other material, whether full or empty, * * * 25 per centum ad valorem; * * *.

Under the well-known definition of agriculture, as the same has been applied in the administration of the customs laws and declared by the courts, we take it there is no question but that the production of milk and milk products is an agricultural pursuit and that dairying is a branch of the agricultural vocation. An article, therefore, whose use is for dairying purposes by those engaged in the dairying business, would, generally speaking, appear to be classifiable as an agricultural implement.

However, it is well established upon both reason and authority that in customs law the classification of merchandise as an agricultural implement is dependent upon the *chief* use of such merchandise. *United States* v. *Boker & Co.*, 6 Ct. Cust. Appls. 243, T. D. 35472; *United States* v. *Duccommun Hardware Co.*, 7 Ct. Cust. Appls. 353, T. D. 36904; *United States* v. *Irwin & Co.*, 7 Ct. Cust. Appls. 360, T. D. 36906; *Richardson & Co.* v. *United States*, 8 Ct. Cust. Appls 179, T. D. 37289; *United States* v. *Lewis & Conger*, 16 Ct. Cust. Appls 91, T. D. 42752.

It is also the established law that classification according to chief use depends upon use by users, as a whole, of the particular type of commodity involved and not upon actual individual use of the particular shipment in question. *United States* v. *Swift & Co.*, 14 Ct. Cust. Appls. 222, T. D. 41706; *United States* v. *Redden*, 13 Ct. Cust. Appls. 224, T. D. 41177; *Durbrow & Hearne* v. *United States*, 12 Ct. Cust. Appls. 225, T. D. 40230; *Brown & Co.* v. *United States*, 7 Ct. Cust. Appls. 309, T. D. 36871; *Magone* v. *Heller*, 150 U. S. 70.

In the several cases cited, *supra*, wherein different articles have been held to be classifiable as agricultural implements by reason of chief use, it appears from the opinions themselves that the proof of use as to such implements was quite full and definite. This is not true of the instant case.

In the instant case the proof of use is contained in the testimony of a single witness who was the president of the Spreckles Creameries Co. (Inc.), which made the importation involved.

We understand importer's contention to be that the milk cans should be classified as agricultural implements because of two alleged facts: First, that they are used on the farm itself by the farmer to transport milk from the barn where the cows are milked to the milk house, and possibly for such general transportation about the farmer's premises as is necessary; and, second, that they are used by organizations composed of farmers, known as cooperative creameries.

Upon the first point the entire evidence is contained in the answer to three questions as follows:

Q. Have you noticed whether or not the farmers or ranchers make any use of these 10-gallon cans on the farm itself?—A. Part of them do.

Q. What do you mean by that answer?—A. If the man having the dairy, and he milks the cows in the barn, he has a milk house, where from the barn he uses the cans to transport his milk over to the part where he stores milk and cream.

Q. Is there any secret [we assume this a typographical error and that the word should be "separate"] use for cans of this sort, except those uses you have told us about?—A. On the farm.

Manifestly this proof is insufficient to show that this particular type of use is the chief use, and we do not understand appellee to really so insist. Its principal insistence is that the use by the so-called cooperative creameries is chief use, and that since these are

organizations composed of farmers it constitutes an agricultural use which justifies the classification of the cans as agricultural implements.

In so far as the record in the instant case discloses, the use of the cans by the so-called cooperative creameries is in all respects the same as that by appellee. Empty cans are sent out and the filled ones taken in to the cooperative plants where the milk is processed, the cans being transported upon trucks or other vehicles.

Very little evidence is adduced, however, as to the nature of the cooperative creamery organizations. It does not appear whether the cans used by them are the property of the organizations as such or of the individual farmers who compose the organization.

Such testimony as bears upon any of these questions is contained in the following:

Q. You have told us about the uses on the farm, and you have told us about the use for sending the milk to the creameries. Is there any other use for these cans?—A. Oh, yes; we use them in the creamery in the city.

Q. In which way, or by which class of people in general are they *chiefly* used, by the farmers in their shipping and farm use or by the creameries?—A. *Well, I don't know; that is a hard question to answer. I can not tell that; that is something I would not mention because I do not know.* If the farmers are considered by the cooperative creameries, they are owned and operated by the farmers. [Italics ours.]

Q. I do not quite understand that.—A. The farmers we have here and in the San Joaquin Valley, we have what is called a cooperative creamery, that is owned by the farmers, and operated by the farmers. Now, it is considered that these cans are used—that are used that way on the farm.

Q. In other words, you mean, do you, that these cooperative farmers' associations are considered to be farmers themselves and the use by them is to be considered a farmer's use. In that case the chief use of these cans is by farmers. Is that what you are trying to say?—A. Yes, I believe that because we have more of these creameries than anything else, these large cooperative creameries.

The foregoing is a part of the direct examination of the one witness called, and it is to be observed that the questions are somewhat argumentative in character and to a certain extent call for answers containing what might possibly be regarded as being more in the nature of a legal conclusion than a statement of facts.

In the cross-examination the following appears:

Q. You testified about a cooperative business; isn't that business similar to the kind of business you do?—A. The same business.

Q. Same business?—A. The same thing.

Q. And what they do is to receive the milk from the farmer just as you do and distribute it; isn't that so?—A. No; they are not distributors.

Q. What are they?—A. They are manufacturers; they manufacture this milk and cream into butter or condensed milk or powdered milk out in the creamery in their own plants.

Q. And don't they sell loose milk and cream like you do?—A. No; as a rule they don't. I don't think there is any in the city that is cooperative. That is mostly out in the farmers' districts. You take—for instance take Danish Creamery, at Fresno; that is one of the cooperative creameries, which is owned and

operated by the farmer who takes the milk to the creamery, separates the milk, churns the cream into butter, uses the skimmed milk for powdered milk or condensed, and whatever is left, why the farmer gets. It is divided up amongst them; whatever the proceeds of the creamery is, so much a month, the farmers get so much for the cream and butterfat; that is a cooperative proposition; ours is not.

Q. Where is the cooperative business conducted; on a farm or in a town?—A. In a town generally.

Q. Now, generally, is it always conducted in a town?—A. No; I would not say it was always in a town; I can name you a dozen cooperative creameries here

Q. Are they all in a town or on a farm?—A. They are not generally on a farm, they might be out of town in the country, and where the farmers get it, and place the creamery. I can take the Point Reyes creamery.

Q. What about the Point Reyes creamery?—A. That is a cooperative creamery.

Q. Where is it located?—A. Point Reyes.

Q. Is that a town?—A. I don't think it is much of a town; I have never been up there.

Q. Is it a farming section?—A. Farming section; yes, sir. The creamery itself might be in a town.

Q. You don't know?—A. I don't know.

Q. Don't these cooperative companies—don't these companies manufacture a different product from what they get?—A. They manufacture butter; they manufacture cheese; they manufacture condensed milk.

Q. It corresponds to a factory on a farm?—A. No; they don't milk cows there.

Q. You would not call it a farming business?—A. No; not the creamery—it is owned by farmers.

Q. That is the only thing that is akin to a farm, the fact the farmers own it?—A. Yes.

From what was developed upon the redirect examination of the witness it appears that the cans have no use in the manufacturing operations, but are simply used for transportation, but there is no evidence anywhere as to how the cans are generally owned, other than the ones of the involved importation and these belong to appellee.

It is manifest that the foregoing testimony is not sufficient to establish the fact that the chief use of these milk cans is upon the farm or by farmers, nor is it sufficient even to show that chief use is for transportation by cooperative creamery organizations composed of farmers.

The appellee creamery company is not itself engaged in agriculture, but in processing an agricultural product, and the chief use satisfactorily shown by the evidence in the case is only that by appellee, which we do not think can be declared agricultural in its nature.

We are not, therefore, presented with a case wherein there is shown chief use either by individual farmers on the farm itself or by organizations of farmers for transportation. Nor does it appear that the chief use is made up of a combination of use on the farm and transportation by farmers' organizations.

It may be further stated that even the transportation used by cooperative creameries shown by the testimony is limited to a section of the State of California, and this, under the doctrine declared by us

in *Pacific Guano & Fertilizer Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 218, 228, T. D. 42240, would not be sufficient. We there said:

The actual use of the tankage in controversy and the chief use of high-grade tankage in California does not determine the classification of the merchandise. Whether tankage of the grade imported was chiefly used as a fertilizer in the United States was the issue presented. What the tankage imported was actually used for and the chief use of high-grade tankage in California did not establish. the chief use of high-grade tankage in the United States. Of course, if it had been proven that most of all high-grade tankage, imported and domestic, was used in California and as a fertilizer, a different case might be presented.

We do not think, therefore, that there is satisfactory evidence in the record to show a character of chief use which entitles the milk cans in question to classification under paragraph 1504 as agricultural implements, and the finding of the Customs Court to this effect is not supported by the testimony.

The case was presented to us, both orally and in the briefs, almost wholly upon the theory that the issue lies between paragraphs 399 and 1504, and little was said relative to the applicability of paragraph 328. Appellee does not, however, waive its alternative claim, but insists that 328 is more specific than 399 if 1504 be not applicable, and further insists that should we so hold there could be no reversal of the case because the Government assigned no error making claim for such classification.

It is unnecessary for us to discuss the question of assignment of error by the Government, because we are unable to agree that paragraph 328 is applicable.

Paragraph 328 reads as follows:

PAR. 328. Lap-welded, butt-welded, seamed, or jointed iron or steel tubes, pipes, flues, and stays, not thinner than sixty-five one-thousandths of an inch, if not less than three-eighths of an inch in diameter, three-fourths of 1 cent per pound; if less than three-eighths and not less than one-fourth of an inch in diameter, 1¼ cents per pound; if less than one-fourth of an inch in diameter, 1¾ cents per pound: *Provided*, That no tubes, pipes, flues, or stays made of charcoal iron shall pay a less rate of duty than 1¼ cents per pound; cylindrical and tubular tanks or vessels, for holding gas, liquids, or other material, whether full or empty; welded cylindrical furnaces, tubes and flues made from plate metal, whether corrugated, ribbed, or otherwise reinforced against collapsing pressure, and all other finished or unfinished iron or steel tubes not specially provided for, 25 per centum ad valorem; flexible metal tubing or hose, whether covered with wire or other material, including any appliances or attachments affixed thereto, not specially provided for, and rigid iron or steel tubes or pipes prepared and lined or coated in any manner suitable for use as conduits for electrical conductors, 30 per centum ad valorem.

The milk cans in issue are so dissimilar in character and use from the article specifically named in the paragraph that we can not believe it was the intent of Congress to include the former in its provisions.

It follows, therefore, in our opinion, that the classification of the collector should stand, and the judgment of the Customs Court is accordingly *reversed*.