UNITED STATES *v.* F. W. MYERS & Co., INC. (No. 4011)[1]

[1] T. D. 48913.

United States Court of Customs and Patent Appeals, March 29, 1937

*Joseph R. Jackson*, Assistant Attorney General (*Charles D. Lawrence*, Special Assistant to the Attorney General, and *William Whynman*, special attorney, of counsel), for the United States.

*Elisha Hanson* for appellee.

[Oral argument February 11, 1937, by Mr. Lawrence and Mr. Hanson]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, and GARRETT,[2] Associate Judges

BLAND, Judge, delivered the opinion of the court:

Forty-nine rolls of paper were imported from Canada into the United States on February 3, 1934. The collector classified the same under the provision of paragraph 1401, Tariff Act of 1930, as "all uncoated printing paper, not specially provided for", and assessed duty at one-fourth of 1 cent per pound and 10 per centum ad valorem.

---

[2] Lenroot, Judge, did not participate in this case.

In appellee's protest it was claimed that the said merchandise was properly entitled to entry free of duty under paragraph 1772 of said act as "Standard newsprint paper."

The United States Customs Court, Second Division, sustained the protest of the appellee and the Government has here appealed from the judgment of said court.

It was stated in oral argument that the paper was ordered to weigh 38 pounds per ream. The bill of lading contains the notation "STANDARD NEWSPRINT PAPER 38# Basis." The Government contends that some of the paper involved here weighed 38 pounds and up to 40 pounds per ream. However, the particular sample submitted to the chemist of the United States laboratory—appraiser's stores—was shown to weigh 36.22 pounds per ream consisting of 500 sheets, 24 by 36 inches. In view of our conclusion, just how much more than 36.22 pounds, if any, the paper weighed, is not of great importance.

The importer offered the testimony of five witnesses, and the Government that of eight witnesses in connection with the issue as to whether or not the imported paper responded to the term "Standard newsprint paper." The testimony is set out in the decision of the trial court and in the briefs of the parties. There is little, if any, dispute as to what the testimony shows. Concerning the weight and effect to be given the testimony there is a wide disagreement between the parties. In view of our conclusion it will not be necessary, as will appear later, for us to state or discuss at length the evidence of record.

In the Government's appeal many errors are assigned, some of which are based upon the rulings of the court to the effect that it was not necessary for the appellee to prove the chief use of paper of the kind, class, or character in question, prior to June 17, 1930, the effective date of the Tariff Act of 1930. It is the main contention of the Government that the record does not show that merchandise of the kind and class of the involved importation was known as "standard newsprint paper" or was chiefly used for the printing of newspapers on, or immediately prior to, June 17, 1930.

We have read the voluminous record with care and we agree with the Government's contention that the record does not establish the chief use of paper of the kind, class or character of that imported prior to the enactment of the Tariff Act of 1930. The case was not tried upon that theory in the court below. It was the contention of counsel for appellee there and here that the imported merchandise and paper like it, when imported, was used in this country, for the printing of newspapers, and that it was not necessary, under this court's holding in *United States* v. *F. S. Whelan*, 22 C. C. P. A. (Customs) 426, T. D. 47424, to prove any chief use prior to the passage of the tariff act. The trial court definitely ruled that it was not necessary

to prove chief use prior to the passage of the tariff act and relied upon our said decision in the *Whelan* case, *supra*.

The Government contended in the court below that "Standard newsprint paper" is only such wood pulp paper as has a weight of "not less than 30 pounds nor more than 35 pounds" for a ream of 500 sheets, 24 by 36 inches, which, the record shows, was the definition of such paper made by the Treasury Department in T. D. 40996, 47 Treas. Dec. 844. Here, it confines the limits of weight to "32 pounds * * * but never in excess of 36 pounds" per ream. As we understand the main contention of the Government, it is that *newsprint paper* is only that kind of wood pulp paper which was chiefly used in this country for the printing of newspapers prior to the passage of the Tariff Act of 1930, and that "Standard newsprint paper" is confined to paper which weighs 32 pounds per ream and up to and including 36 pounds per ream.

The appellee, agreeable to the statement of some of its witnesses, contends that the addition of the word "Standard" adds nothing to and takes nothing from the term "newsprint paper" and, in substance, argues that in determining what "Standard newsprint paper" is, we may ignore the word "Standard."

Some of appellee's witnesses distinguish "Standard newsprint paper" from *newsprint paper*, and practically all the testimony offered by the Government is to the effect that *newsprint paper* is a broader term than "Standard newsprint paper." There is practical unanimity, however, between the witnesses for the Government and the witnesses for the appellee that 32 pounds per ream is the "basis" or "basic weight." This "basic weight" became well understood, prior to 1922, in the wholesale newsprint paper trade after a committee of paper manufacturers had met and adopted said 32-pound weight as the basic weight for contract purposes. A standardized form of contract was adopted fixing 32 pounds as the basis. Certain tolerances were allowed in the contract. But we regard the action of the Treasury Department and the said committee and many other facts found in the record to be of little importance in determining the controlling issue presented here.

In the *Whelan* case, *supra*, we had under consideration one car out of forty-four cars of paper imported, the width of the paper in controversy being 15¾ inches. It was in all respects the same quality and type of paper except in one dimension—width—as the paper in the other forty-three cars which was admittedly free of duty as "Standard newsprint paper" and was used by the Cincinnati Enquirer in printing the magazine and comic sections of its regular Sunday editions. It was imported and used after the effective date of the Tariff Act of 1930. The Government there contended that it was necessary to show that paper only 15¾ inches wide was chiefly used

for printing newspapers prior to or at the time of the passage of the Tariff Act of 1930. A careful reading of the opinion discloses that not only did the Government call this court's attention to its contention, but that in a dissenting opinion the subject matter of the Government's contention was raised. It was the opinion of the court that the paper involved belonged "to a class chiefly used for the printing of newspapers." The court then referred to *Crown Willamette Paper Co. v. United States*, 16 Ct. Cust. Appls. 431, T. D. 43187, and *United States v. James P. Heffernan Paper Co.*, 17 C. C. P. A. (Customs) 61, T. D. 43358, in which it was said that the chairman of the Committee on Ways and Means in reporting the bill, which became the Tariff Act of 1922, to the House of Representatives, stated that: "It [standard newsprint paper] is that form of print paper upon which newspapers are printed." It was the view of the court in the *Whelan* case, *supra*, that the paper involved belonged to a class of paper concerning the free status of which there was no dispute, and the word "class" was there italicized in the expression used by the court which was a quotation from the *Crown Willamette Paper Co.* case, *supra*.

To understand better our decision in the *Whelan* case, *supra*, it is well to consider the two decisions, on substantially the same question, which had preceded it. In the *Crown Willamette Paper Co.* case, *supra*, we had before us rolls of paper 10⅞ and 12 inches wide and also the same grade of paper 9 inches long by 6 inches wide, in sheets. It was the same grade of paper and identical in every particular, except as to dimensions, with "Standard newsprint paper", concerning the free status of which there was no question. A newspaper could not be printed on the paper then at bar on account of its width in one instance and its width and length in the other. The legislative history of the Tariff Act of 1922, where the term "Standard newsprint paper" first appeared, was reviewed at great length. Mr. Fordney's statement in reporting the bill to the House that "it [Standard newsprint paper] is that form of print paper upon which newspapers are printed" was referred to as showing that it was not the congressional intent to free list paper which could not be used in the printing of newspapers. It was not intended there to pass upon the question of *chief* use or at what period of time chief use should be proven, since no newspaper use of the importation could be made.

In the *Heffernan* case, *supra*, the question of proof of chief use at or prior to the date of the passage of the tariff act was moot. The Government's contention there was that this paper was not of the size, kind, or quality, ordinarily and generally used by newspapers in printing their regular editions, and although it was admitted that this paper was used by some weekly newspapers, it was also shown that it was used for box and trunk linings, pen and ink tablets, job printing, etc. The importer in that case merely attempted to prove susceptibility for

use. We answered that contention and said that proof of suscepti-
bility for use was not sufficient and that in order for the paper to be
"Standard newsprint paper" actual chief use must be proven. We
there said:

In applying the doctrine of use, courts have frequently said that a fugitive use,
an occasional use, a possible use, or a susceptibility for use is not sufficient, but
that chief use should be the test, unless the legislative intent was shown to be
otherwise. To hold otherwise would lead to hopeless confusion in the applica-
tion of the doctrine of use. *United States* v. *Bloch & Co.*, 13 Ct. Cust. Appls. 5,
T. D. 40847; *United States* v. *Paul G. Downing et al.*, 16 Ct. Cust. Appls. 556,
T. D. 43294.

Now, if country newspapers with flat-bed presses use the paper in controversy,
and this is the chief use of the paper, we can not see why it is not standard news-
print paper, and, therefore, free of duty. On the contrary, if such papers are
printed on poster paper, book paper, or any other kind of paper which is chiefly
used for other purposes, obviously Congress. had not intended, by the use of the
words "standard newsprint paper", to include it within the term.

We concluded that the importation there in controversy had not
been shown to be chiefly used for printing newspapers *at any time* and
that it was, therefore, not "Standard newsprint paper." Under the
facts there it was obvious that the paper there involved was not
even *newsprint paper*.

The term *newsprint paper* is an *eo nomine* provision. It indicates
the use to which the paper is put. "Standard newsprint paper" is
also an *eo nomine* designation and suggests its use. The particular
kind of newsprint paper free listed was "Standard newsprint paper."

Under the well-settled rule of this and other courts, an *eo nomine*
designation, the meaning of which is in question, must be determined
as of the date of the passage of the act. In determining the meaning
of a word which meaning depends upon its use, it has always been the
law that proof of that use is confined to the time prior to and on the
date of the passage of the act in which the term is used. In other
words, what did the term mean when Congress used the same?
*Goldsmith's Sons* v. *United States*, 13 Ct. Cust. Appls. 69, T. D. 40932;
*Wilbur-Ellis Co.* v. *United States*, 18 C. C. P. A. (Customs) 472,
T. D. 44762.

The term *newsprint paper* has reference to its use in printing news-
papers and in order to prove whether an imported paper is newsprint
paper, proof should be directed to the chief use of the kind or class of
paper imported on the date of the passage of the act. The exact
term before us, the meaning of which is in question, is "Standard
newsprint paper." It seems obvious that "Standard newsprint
paper" is a narrower term than *newsprint paper*, but, in order for it
to be "Standard newsprint paper" it must first be *newsprint paper*.
In the instant record, there has been no attempt to prove that the
imported paper, or paper of its weight and kind, was, prior to June

17, 1930, or at any other time for that matter, chiefly used for printing newspapers.

The classification of the collector carries with it the presumption that the imported article was not that kind of paper which, in this country, on the effective date of the act was chiefly used in the printing of newspapers. Appellant has not overcome this presumption by proof that this kind of paper was used subsequent to the passage of the act in printing the Christian Science Monitor or in proving that subsequent to the passage of the act any other newspapers were printed on this kind of paper. Evidence as to use of the imported paper, subsequent to the passage of the act, may be competent as corroborative evidence. It may show susceptibility of the paper for a certain use, but proof of susceptibility, we have held, is not sufficient. The testimony fails to show that *imported* paper weighing 36.22 pounds per ream was chiefly used in the printing of newspapers, much less does it show that paper of this weight and kind *manufactured and used in this country* was chiefly used at any time for the printing of newspapers. That paper produced in this country as well as imported paper should be considered is well settled. *United States* v. *S. Schapiro & Sons*, 24 C. C. P. A. (Customs) 343, T. D. 48771.

While the Government was not obliged to prove the chief use of the paper, it seems to us that the weight of the evidence in the record, including that produced by the Government, indicates that paper of this kind, prior to the passage of the act in question and also on the dates when the testimony was offered, was used in this country chiefly for job work, children's books, drawing paper, raw stock for wall paper, and many uses other than that of printing newspapers. The record makes it clear why this is true. Since 40 per centum of the cost of publication of a newspaper, according to the testimony, is in the paper used, the expense would be too great. In order to cheapen the price of the newspaper, it has always been the general policy of publishers to use paper as light in weight as is practicable, taking into consideration the fact that if the paper was too thin, the printing on one side of the paper would "show through" on the other. Appellee has shown that for photogravure purposes, and for special editions and on exceptional occasions, and for magazine sections in some instances, papers approaching the weight of 36 pounds have been used. It is shown that in one or more instances, newspapers in this country such as the Christian Science Monitor have used paper as heavy as that involved here. This is far from proving that paper of the kind at bar was, prior to the passage of the Tariff Act of 1930, chiefly used in the printing of newspapers.

Appellee, therefore, failed to prove that the imported paper was *newsprint paper*. It is the contention of the Government, as before stated, that Congress intended only, by the Tariff Act of 1930, as well

as the Tariff Act of 1922, to free list that character of *newsprint paper* which was regarded as standard and that "Standard newsprint paper" had a definite and uniform meaning in the trade prior to the passage of the Tariff Act of 1930 which excluded any paper of greater weight than 36 pounds. The record does show an attempt at standardization on the part of those interested in buying and selling newsprint paper and, as far as the record shows, these attempts resulted in the establishment of a basis far below the weight of the paper here involved. However, having found that there is nothing in this record which shows that the involved paper is *newsprint paper*, it is not necessary for us, in this case, to determine the exact and precise meaning of the term "Standard newsprint paper." Of course, we cannot read out of the statute the term "Standard." Congress had something in mind by the use of the term. There must have been some standard of newsprint paper known to the trade at the time of the passage of the act. Future cases may call for a more precise definition of the term, but, for reasons stated, it need not be so defined here.

In argument before this court, but not in brief, appellee's counsel took the position that even though it be concluded that paper of the weight and exact character of that involved here was not shown to have been chiefly used for printing newspapers prior to the passage of the act that it nevertheless *belonged to that class of paper which on said date was admittedly "Standard newsprint paper."* This contention invokes the principle announced by this court in *United States v. Swift & Co.*, 14 Ct. Cust. Appls. 222, T. D. 41706. It is obvious that a slight or inconsequential change in "Standard newsprint paper", made subsequent to the passage of the act, might not take it out of the class of paper known as "Standard newsprint paper", notwithstanding the fact that it could be said that no paper like the new paper was in existence at the time of the passage of the act. These changes or differences might not change its character so as to take it out of the class of papers which existed prior to the passage of the act. Under such circumstances, it might belong to the class of papers known as "Standard newsprint paper."

We are of the opinion that, in view of the facts of record in the instant case and the aforementioned circumstances, the involved paper cannot be regarded as belonging to a class of papers which, prior to the passage of the Tariff Act of 1930 was "Standard newsprint paper." It is urged by appellee that the record shows that the only difference between the involved paper and the ordinary newsprint which the Government admits is "Standard newsprint paper" is that in making the same at the paper mill, the faucet or cut-out regulating the flow of the pulp into the paper-making machine is opened to increase the supply of pulp and that the weight of the paper is increased

thereby. It is urged that it is of the same composition—wood pulp, sulphite, etc.—as is that paper which is admittedly "Standard newsprint paper" and that since it is used to some extent in printing newspapers in this country, it belongs in a class with "Standard newsprint paper." If these facts with reference to the process of manufacture were conceded, it would nevertheless, be our opinion that appellee's contention is without merit. Newspapers might, under exceptional circumstances, be printed upon wood pulp paper weighing 40 pounds or more per ream. The record makes it clear that it is not practicable to use this character of paper for printing newspapers and that it is particularly fitted for and is used for purposes other than for printing newspapers. It comes into competition in this country with domestically produced printing papers (not newsprint) some of which contain rags. To contend that merely because some one may, under exceptional circumstances, use job work paper for printing his newspaper brings the paper used within the class or kind to which "Standard newsprint paper" belongs is tenuous.

Not only does the record show that, in the making of paper of the weight of that at bar, the cut-off valve is opened so as to permit more pulp mixture to flow, but some additional process must be observed with reference to the dryer which dries the pulp mixture. One of appellee's witnesses stated that the dryer was run faster and was closed in. Another stated that a particular dryer was used. While this testimony with reference to the dryer is not regarded as controlling here, it is a fact, nevertheless, proper to take into consideration.

Being of the opinion that the record does not show that paper of the kind and class of that imported should have been classified free of duty as "Standard newsprint paper," it follows that the judgment of the United States Customs Court should be, and it is, *reversed*.

GARRETT, Judge, dissents.