UNITED STATES *v.* C. J. TOWER & SONS (No. 4126) [1]

---

[1] T. D. 49534.

United States Court of Customs and Patent Appeals, April 4, 1938

*Joseph R. Jackson,* Assistant Attorney General (*Charles D. Lawrence,* Special Assistant to the Attorney General, and *William Whynman,* special attorney, of counsel), for the United States.

*Barnes, Richardson & Colburn* (*Samuel M. Richardson* and *Joseph Schwartz* of counsel) for appellee.

[Oral argument February 9, 1938, by Mr. Lawrence and Mr. Samuel M. Richardson]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD and LENROOT, Associate Judges

BLAND, Judge, delivered the opinion of the court :[2]

This appeal involves the classification, under the Tariff Act of 1930, of certain paper entered at Niagara Falls, N. Y. Two shipments are involved, one entered on January 8, 1934, the paper being invoiced as "67 rolls Std. Newsprint 15″ White," and the other entered on December 28, 1934, the paper being invoiced as "White Standard Newsprint 16 rolls 15″." The record shows that appellee imported the paper for the account of the Greater Buffalo Press, Inc.

The merchandise was classified by the collector and assessed with duty at 10 per centum ad valorem and one-fourth of 1 cent per pound under paragraph 1401 of said tariff act.

Appellee protested said classification and assessment of duty, claiming the merchandise to be free of duty under paragraph 1772 as "Standard newsprint paper."

The competing paragraphs read as follows:

PAR. 1401. Uncoated papers commonly or commercially known as book paper, and all uncoated printing paper, not specially provided for, not including cover paper, one-fourth of 1 cent per pound and 10 per centum ad valorem: * * *.

PAR. 1772. Standard newsprint paper.

Both parties introduced testimony, and samples of the same kind of paper as that involved in the entries at bar but from subsequent importations were introduced in evidence.

The trial court made the following findings of fact:

1. That the paper involved in the present case meets all the requirements for standard newsprint paper set forth in T. D. 40996, 47 Treas. Dec. 844, except that it is imported in rolls which are 15 inches instead of 16 inches wide.

2. That all of said paper was actually used in the printing of newspapers.

3. That all of the paper similar to that here involved and of the same width imported from Canada by the plaintiffs since the beginning of 1934 has been used only for the printing of newspapers.

4. That the paper in question has been previous to 1930 and is now chiefly used for the printing of newspapers.

---

[2] JACKSON, Judge, took no part in the consideration or decision of this case.

Judgment was entered sustaining appellee's protest and from such judgment the Government took this appeal.

On the subject of the character and use of the paper, the appellee introduced the testimony of one witness, while the Government introduced the testimony of five witnesses. There is not much dispute about the facts in this case, and we think that the material facts may be summarized as follows:

The paper actually involved in the importations at bar, according to the testimony of John W. Koessler, who was connected with the Greater Buffalo Press, Inc., was all used in printing newspapers. He testified that imported paper like that at bar had been since 1934 and on the date of importation used by Koessler's company in printing colored supplements and other sections of certain daily newspapers as well as in certain weekly publications which the witness Koessler owned; that the paper imported was of the exact weight, texture, and quality as, and similar in every respect to, paper upon which newspapers are generally printed and which is admitted into this country free of duty, except that the instant rolls of paper are only 15 inches wide.

There is no showing in the record that paper of the width involved here was at any time chiefly used for printing newspapers. While there is no definite proof in the record as to the chief use in the United States of paper of this particular character at any time, certain witnesses testified that paper like that involved here, which they sold, was sold for purposes other than the printing of newspapers. There is no testimony in the record as to the chief use of paper such as is here involved (15 inches wide) on or prior to June 17, 1930. The trial court declined to permit the Government to prove facts tending to show the chief use of paper like that here involved (rolls 15 inches wide) on or prior to June 17, 1930, and the Government has here assigned error challenging the court's ruling in this respect.

In the decision of the court below, it will be noticed that finding of fact No. 4 is:

4. That the paper in question has been previous to 1930 and is now chiefly used for the printing of newspapers.

As we interpret this finding of fact, it refers to paper of the particular kind *and width* here involved. There is no evidence to support the first part of the finding that paper of the width and character of that involved here was, previous to 1930, chiefly used for printing newspapers. The record, when considered as a whole, does not support the conclusion that paper of a width of 15 inches was, on the date of taking the testimony in the instant case used chiefly for printing newspapers.

4

As we understand the decision of the trial court, it regarded the decision of this court in *United States* v. *F. S. Whelan*, 22 C. C. P. A. (Customs) 426, T. D. 47244 [47424], as controlling its decision of the issue in the instant case. This fact will necessitate a careful consideration of that case.

Before discussing the *Whelan* case, *supra*, and other cases involved, we think it important to state the main question for determination here. It is: Was appellee required to establish that paper such as is here involved, or paper of the class to which the involved paper belonged, was chiefly used for printing newspapers on or prior to June 17, 1930? At the outset we answer that question in the affirmative. *Goldsmith's Sons* v. *United States*, 13 Ct. Cust. Appls. 69, T. D. 40932; *Wilbur-Ellis Co. et al.* v. *United States*, 18 C. C. P. A. (Customs) 472, T. D. 44762. The query then occurs: Has appellee met that requirement? The answer to this query depends upon a determination of whether or not paper in every respect similar to that which is conceded to be "Standard newsprint paper" except as to width (being 15 inches wide only), is such paper as belongs to the class of paper which was chiefly used for printing newspapers on and prior to June 17, 1930. While it is not improper to consider the use of paper which constituted the instant importation for the purpose of determining its character, it is well settled that such use is not controlling of its classification. *United States* v. *Swift & Co.*, 14 Ct. Cust. Appls. 222, T. D. 41706. The chief use of all imported paper and paper produced in this country, of the particular type and width as that at bar, on the date of importation, is also not controlling. *United States* v. *F. W. Myers & Co., Inc.*, 24 C. C. P. A. (Customs) 464, T. D. 48913.

It is equally well established that the mere fact that paper like that involved (15 inches wide) was not chiefly used for printing newspapers on or prior to the passage of the tariff act is not necessarily controlling if it is held that it belonged to a class of paper which was chiefly used for printing newspapers on and prior to the date of the passage of the act. It seems to us, therefore, under the instant record, that the ultimate question to be determined is whether or not the particular paper here involved should be held to belong to a class or standard of newsprint paper which was admittedly chiefly used for printing newspapers on and prior to June 17, 1930.

"Standard newsprint paper" is a designation by use. In determining the meaning of an *eo nomine* designation, which meaning is determined by its use, we must determine that meaning in accordance with its proven chief use on and prior to the date when the language which is being interpreted was used by Congress. *Goldsmith's Sons* v. *United States*, *supra*; *Wilbur-Ellis Co. et al.* v. *United States*, *supra*; *United States* v. *F. W. Myers & Co., Inc.*, *supra*.

In order that the *Whelan* case, *supra*, may be properly understood and that our present attitude toward it may be made clear, we think it important that we briefly review this court's decisions involving questions relating to the tariff duty status of imported papers claimed to be "Standard newsprint paper."

In *Crown Willamette Paper Co.* v. *United States*, 16 Ct. Cust. Appls. 431, T. D. 43187, we had before us, *inter alia*, rolls of paper in every respect similar to that which was admitted to be standard newsprint paper except that the rolls were 10⅞ inches and 12 inches wide. It was conceded that no newspaper in the United States was printed on paper less than 16 inches wide. At the time of the passage of the Tariff Act of 1922, when the term "Standard newsprint paper" first appeared in tariff legislation, there was before Congress the report of the Committee on Ways and Means in which it was stated that the term "standard newsprint" meant "that form of print paper upon which newspapers are printed." We held in that case that since the paper involved was of a width which made it not susceptible of use for newspaper printing, it was not the character of paper intended to be free listed.

Soon after the decision in the *Crown Willamette Paper Co.* case, *supra*, this court in *United States* v. *James P. Heffernan Paper Co.*, 17 C. C. P. A. (Customs) 61, T. D. 43358, considered the classification of paper which was not shown to be chiefly used for printing newspapers at the time of importation or prior to the passage of the act, but which paper *was susceptible* of a newspaper use, since it was of a proper width, but differed in other respects from that which was ordinarily regarded, and is regarded in the instant case, as "Standard newsprint paper." The record there showed that the imported paper was used only fugitively for printing weekly newspapers and that it was used for box and trunk linings, pen-and-ink tablets, cheap writing paper, catalogs, etc. This court held, in substance, that the mere fact that it was susceptible of having a newspaper use was not sufficient to characterize it as "Standard newsprint paper." In other words, lack of susceptibility would keep it out of the free list provision, but the fact that it was susceptible of a newspaper use would not necessarily bring it into the provision. The trial court had applied the doctrine of suitability for use. The doctrine of chief use was applied by us, and we reversed that portion of the judgment which had sustained the importer's protest.

The case to which special attention must be given is the *Whelan* case, *supra*. The record in that case showed that forty-four cars of paper were imported, one of the cars containing 27 tons of paper which was in rolls 15¾ inches wide, and which paper was exactly similar in all respects, except as to width, to the paper in the 43 cars in the same shipment which paper was admitted duty free as "Stand-

ard newsprint paper." The evidence showed that the paper there in controversy was used by the Cincinnati Enquirer in printing the magazine and comic sections of the regular Sunday editions. The Government argued that for the paper to be free of duty it was necessary to show that paper of the width of 15¾ inches, on the date of the passage of the Tariff Act of 1930, which act was there involved, was chiefly used in the printing of newspapers. The court held that the paper involved belonged to a class which was chiefly used for the printing of newspapers and in effect held that its width was not determinative of the question of the class to which it belonged. If the paper there in controversy, taking into consideration all its characteristics including its width, belonged to a class of paper which, on the date of the passage of the act, was chiefly used for printing newspapers, it, of course, was immaterial whether or not paper of that particular width was ever chiefly so used.

It will be observed that the facts in the instant case are quite similar indeed to those in the *Whelan* case, *supra*, except that in the instant case there exists a difference of three-quarters of 1 inch in the width of the paper. It must be frankly conceded that the facts in the *Whelan* case are nearer on all fours with the facts involved in the instant case than any other case called to our attention and that the trial court properly interpreted the *Whelan* case. If our conclusion in that case was correct, it seems clear that the judgment appealed from at bar must be affirmed. If, on the contrary, we are convinced that the width of the paper in that case and the width of the paper in the instant case are controlling factors requiring a holding that paper of this width does not belong to a class of printing paper which was chiefly used for printing newspapers on or prior to the passage of the tariff act, the decision in the *Whelan* case must be overruled and the judgment in the instant case must be reversed.

Under the circumstances related, it is, in a sense, regretable, that we must arrive at a conclusion that makes it necessary for us to reverse the judgment of the trial court which properly interpreted and literally applied our holding in the *Whelan* case. But since, after much consideration, we are of the opinion, for the reasons hereinafter stated, that our conclusion that the 15¾-inch paper involved in the *Whelan* case belonged to the class of paper chiefly used for printing newspapers and was "Standard newsprint paper" was erroneous, we must overrule our said holding in that case.

It appears in the instant record that the kind of paper at bar, when given a newspaper use, is used in the printing of special sections of regular daily newspapers or special weekly publications and that it is not that width of paper which is most generally used in the printing of newspapers. On the contrary, the testimony of those who testi-

fied concerning the sale of paper of this character was to the effect that it was not sold by them for newsprint purposes but to people who manufactured sales books, tablets, scratch pads, etc.

It surely results in no anomaly, nor does it seem to be contrary to the declared intent of the legislature, to hold that the paper at bar, which was not shown to be chiefly used for printing newspapers on and prior to the passage of the Tariff Act of 1930, and which by reason of its character did not belong to the class of newsprint which was so chiefly used at that time, should be denied free entry. Evidently it comes in direct competition with that character of paper which Congress made dutiable in both the tariff acts of 1922 and 1930. Congress evidenced no concern about cheapening paper for use in scratch pads, job work, and similar uses. Obviously, the intended purpose of free listing "Standard newsprint paper" was to lower the price to the newspaper owner and possibly lower the price of the newspaper to the reading public, and for the additional purpose of conserving our natural resources. But Congress indicated no such generous intention relating to other kinds of paper. It seems clear that at the time the Committee on Ways and Means reported that the bill, which became the Tariff Act of 1922, was intended to free list the kind of paper upon which newspapers were printed, it would not, by including under the free list such paper as is at bar, have furthered the purpose of cheapening the production of newspapers.

The case of *United States* v. *F. W. Myers & Co., Inc., supra,* cited in the opinion of the trial court and in the briefs of the parties hereto, has bearing upon the main question presented here only in the application of certain principles there announced. In that case, paper heavier than that generally used for newspaper printing was at bar. After the passage of the Tariff Act of 1930, paper of that weight was used in printing the regular issues of the Christian Science Monitor and possibly also fugitively used in the printing of other papers. One phase of the importer's argument in the *Myers* case, *supra*, was to the effect that the weight and character of that paper, as long as the importation was actually used for printing newspapers, did not take it out of the class of "Standard newsprint paper" and that it was, therefore, entitled to a free entry status. Concerning this argument, we there said:

In argument before this court, but not in brief, appellee's counsel took the position that even though it be concluded that paper of the weight and exact character of that involved here was not shown to have been chiefly used for printing newspapers prior to the passage of the act that it nevertheless *belonged to that class of paper which on said date was admittedly "Standard newsprint paper."* This contention invokes the principle announced by this court in *United States* v. *Swift & Co.,* 14 Ct. Cust. Appls. 222, T. D. 41706. It is obvious that a slight or inconsequential change in "Standard newsprint paper," made subsequent to the passage of the act, might not take it out of the class of paper known as "Standard news-

print paper," notwithstanding the fact that it could be said that no paper like the new paper was in existence at the time of the passage of the act. These changes or differences might not change its character so as to take it out of the class of papers which existed prior to the passage of the act. Under such circumstances, it might belong to the class of papers known as "Standard newsprint paper."

We are of the opinion that, in view of the facts of record in the instant case and the aforementioned circumstances, the involved paper cannot be regarded as belonging to a class of papers which, prior to the passage of the Tariff Act of 1930 was "Standard newsprint paper." It is urged by appellee that the record shows that the only difference between the involved paper and the ordinary newsprint which the Government admits is "Standard newsprint paper" is that in making the same at the paper mill, the faucet or cut-out regulating the flow of the pulp into the paper-making machine is opened to increase the supply of pulp and that the weight of the paper is increased thereby. It is urged that it is of the same composition—wood pulp, sulphite, etc.—as is that paper which is admittedly "Standard newsprint paper" and that since it is used to some extent in printing newspapers in this country, it belongs in a class with "Standard newsprint paper." If these facts with reference to the process of manufacture were conceded, it would nevertheless, be our opinion that appellee's contention is without merit. Newspapers might, under exceptional circumstances, be printed upon wood pulp paper weighing 40 pounds or more per ream. The record makes it clear that it is not practicable to use this character of paper for printing newspapers and that it is particularly fitted for and is used for purposes other than for printing newspapers. It comes into competition in this country with domestically produced printing papers (not newsprint) some of which contain rags. To contend that merely because some one may, under exceptional circumstances, use job work paper for printing his newspaper brings the paper used within the class or kind to which "Standard newsprint paper" belongs is tenuous.

In that case, the chief use of the particular paper involved, and paper of its weight and character, was not shown, but the evidence indicated that paper of that kind prior to the passage of the tariff act and at the time the testimony was taken, was used in this country for job work, drawing paper, wall paper, etc. We held that owing to the weight of that paper it did not respond to the term "Standard newsprint paper." Weight was a controlling factor there. We think width is a controlling factor here. It is not seen how the element of width is less important than the element of weight in arriving at the classification of printing paper. Undoubtedly, the question of the width of paper, owing to the size of printing presses generally and of most newspapers, should be regarded as an essential element in determining whether the paper at bar is of that class of newsprint which Congress freelisted as "Standard newsprint paper."

In the *Myers* case, *supra*, we did not undertake to define the exact meaning of "Standard newsprint paper," but stated that we could not read out of the statute the term "Standard"—that Congress had something in mind when it used that term. Upon the instant record, it is not necessary for us to go further in that respect than we did there.

We there said that there must have been some standard of newsprint paper known to the trade at the time of the passage of the tariff act, and we concluded that paper of the weight involved there and suitable for the uses for which the record showed it was used other than printing newspapers, was not "Standard newsprint paper." In the instant case, applying the principles adopted in the *Myers* case, *supra*, we are of the opinion that the importer has not met the burden imposed upon it of showing that the merchandise involved should have been classified as "Standard newsprint paper."

In view of our conclusion, it will not be necessary for us to consider the assignment of error on the part of the Government directed against the refusal of the trial court to permit the Government to introduce testimony as to the use of paper like that involved prior to the passage of the Tariff Act of 1930, nor, under the circumstances, is it necessary for us to pass upon any assignment relating to or which might involve the validity or force and effect to be given to T. D. 40996, which purported to define "Standard newsprint paper." The effect of that particular Treasury Department action was commented on by this court in the *Hefferman* case, *supra*.

For the reasons heretofore stated, the judgment of the United States Customs Court is *reversed*.

### DISSENTING OPINION

GARRETT, Presiding Judge: I adhere to the views expressed and the conclusion reached by the majority in the case of *United States* v. *F. S. Whelan*, 22 C. C. P. A. (Customs) 426, T. D. 47244, which is overruled in express terms in the majority opinion in the instant case, and, since I regard the instant case as being in principle the same as that, I respectfully dissent.