TAYLOR *et al. v.* UNITED STATES (No. 885).[1]

SUBSTANCES USED ONLY FOR MANURE.

The rape meal of the importation was assessed as a nonenumerated manufactured article under paragraph 480, tariff act of 1909.   It was claimed to be a substance used only for manure and to be dutiable accordingly.

The evidence strongly tends to show that rape meal is used in this country as suitable for feeding stock, but it is sufficient to support the collector's finding that the importers failed to show the merchandise is of a class that has no common, practicable, or profitable use other than use as manure.

United States Court of Customs Appeals, February 1, 1913.

APPEAL from Board of United States General Appraisers, Abstract 28066 (T. D. 32379).

[Affirmed.]

*Walden & Webster (Henry J. Webster* of counsel) for appellants.

*William L. Wemple,* Assistant Attorney General (*Charles E. McNabb,* assistant attorney, of counsel; *Leland N. Wood,* assistant attorney, on the brief), for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

BARBER, Judge, delivered the opinion of the court:

The importations are rapeseed meal, which was by the collector assessed for duty at 20 per cent ad valorem under paragraph 480 of the tariff act of August 5, 1909, as a nonenumerated manufactured article.    The importers claim the merchandise to be entitled to free entry under paragraph 581 of the same act, which reads as follows:    ˋ

581. Guano, manures, and all substances used only for manure, including basic slag, ground or unground, and calcium cyanamid or lime nitrogen.

ˊThe Board of General Appraisers overruled the protest, held that the term "substances used only for manure" applied to a general class rather than to a particular importation, and that the question to be determined was not what was to be done with a particular importation, but was rather whether the commodity was commonly, practically, and profitably used for other purposes than as manure; and, although their opinion does not so expressly state, it is manifestly based upon their conclusion that the importers had failed to

─────────────

[1] Reported in T. D. 33162 (24 Treas. Dec., 158).

show that this rapeseed meal was a substance used only for manure within their interpretation of the paragraph.

The importers. the appellants here, contend that the evidence establishes that there are two distinct grades or classes of rapeseed meal, one of which is used only for feeding live stock and the other as a fertilizer only, and that upon the evidence heard by the board it should have found that these importations belong to the latter class.

We do not understand that the importers really contend for a different construction of the paragraph than that given to it by the board, but they do ask, if the court should be of opinion that the actual use to which these particular shipments were put is a material fact, that a new trial should be ordered, to the end that they may introduce evidence upon that question, which evidence it is contended was offered but was excluded by the board.

The merchandise was entered as "rape meal," but at the time was claimed by the importers to be entitled to free entry as a substance "used only for manure." In his report the collector states that "as no substantial evidence was produced to show that this commodity is a substance fit only for manure, it was classified as a nonenumerated manufactured article."

The importers at the hearing before the board offered the deposition of Mr. Garrat, of Liverpool, England, who testified upon direct interrogatories proposed by the importers in substance that he was a member of the firm which manufactured the imported merchandise and that its business was the manufacturing and dealing in fertilizers and cattle-feeding stuffs; that they sold rapeseed meal but did not manufacture it; that they only bought rapeseed meal for fertilizing purposes; that some rapeseed meal was used for mixing with feeding stuffs; that in his country it was not used for feeding cattle or any animals; that, mixed with some other substance, it was used by compound-cake manufacturers because it was cheaper than genuine cattle feed; that the quality of rapeseed meal covered by the importations in question was only fit for fertilizing, because it contained wild seeds and sand and had not been through any cleaning process; that he had never exported to the United States any rapeseed meal fit for cattle feeding; that the merchandise involved here was sold for fertilizing and to fertilizer companies.

Upon cross-interrogatories proposed in the deposition he further testified that he bought the rapeseed meal covered by these importations, but had nothing to do with its manufacture; that high-grade feed stuffs showing the same percentage of protein and fat as contained in rapeseed meal would sell for a much higher price than rape meal and that it would be an extraordinary matter if his firm exported a fertilizer that could be used for feeding purposes, when if suitable for feeding purposes it would be worth a great deal more than for a fertilizer; that the importations were prepared for fertiliz-

ing purposes only; that rapeseed intended for feeding purposes would contain the best seed and especially cleaned and screened; that in order to determine whether the rapeseeds which his firm handled and manufactured contained any admixtures of other seeds and vegetable substances would require the analysis thereof by an analytical chemist; that he had submitted samples of various shipments made by his firm to leading chemists, all of whom reported that it was fit only for fertilizer and not fit for feeding live stock, and showed also the presence of wild seeds and excessive sand; that he was familiar with all articles sold in his country for feeding cattle; that there was only one grade of rape meal made for fertilizing, and that in his country there was no room to sell a low-grade article at a fancy price and that no one there considered rape meal a food; that it was an excellent fertilizer, of special value on heavy lands; that he used it for top dressing upon grass lands and in his vegetable garden, and that he would not feed it to his cow.

Much of this testimony was received subject to the objection of the Government, but no question as to its admissibility is raised by an appeal of the Government to this court.

The Government called as a witness Mr. Riddle, a gentleman farmer and a chemist, who received his education in the University of Pennsylvania, who testified that he knew rapeseed meal; that he had used it as feed for live stock on his farm on more than one occasion and with satisfactory results. He was shown a sample of the merchandise in question and was asked to make such an examination thereof as he could at the time he was testifying and state whether from his knowledge of the commodity it was of the same or similar character to that which he had used, as he above testified. The record at this point does not show what examination he gave the merchandise, but he proceeds to testify that he thought it was better than what he had seen; that different sorts of grain used as feedstuffs contained more or less weeds and other impurities; that as a general thing they were not thereby rendered unsuitable for feeding purposes; that he had used corn, cotton seed, soya-bean meal, and linseed meal as feed stuffs; that he knew of no rapeseed meal on the market that was unhealthful for cattle to eat.

Some of this testimony of Mr. Riddle was objected to upon the ground that the rapeseed meal he had used was not shown to be of the character of the merchandise under consideration. It is not stated in brief or argument why Mr. Riddle's testimony was not admissible, nor are we able to discover why it was not so.

We think this evidence as a whole tends to show that in England the importations before us and other merchandise of the same kind would not be considered as suitable for feeding stock, but that it tends to show that in this country the reverse is true and is sufficient to support the finding that the importers have failed to show that the mer-

chandise is of a class that has no common, practical, or profitable use other than as manure.

In Magone v. Heller (150 U. S., 570), discussed and reaffirmed in Magone v. Weiderer (159 U. S., 555), the Supreme Court considered the meaning of the term "substances expressly used for manure," which was employed in a predecessor of paragraph 581. Construing this term, the court held it to mean "substances the only common use of which, either by themselves or in combination with other materials, is for the purpose of fertilizing the soil."

The difference in the two statutes is that the expression "substances used only" has been substituted for "substances expressly used." We think there is no appreciable difference in the meaning of these two expressions, in view of the context and of the manifest purpose of the paragraphs, which is for the benefit of agriculture.

We conclude upon an examination of the decisions cited in the opinion of the board in this case that its construction of the term "substances used only" is in accord with the view above expressed. This interpretation, we think, is sound and fully sustained by the authorities cited.

The result is that the judgment of the Board of General Appraisers is *affirmed*.