(C. D. 237)

GERHARD & HEY CO., INC. *v.* UNITED STATES

United States Customs Court, Second Division

Decided October 23, 1939

*Pickrell & McDonald* (*Daniel P. McDonald* and *Max Greenblatt* of counsel) for the plaintiff.

*Webster J. Oliver*, Assistant Attorney General (*Joseph E. Weil* and *Richard E. FitzGibbon*, special attorneys, and *Joseph A. Howard, Jr.*, junior attorney), for the defendant.

Before TILSON, KINCHELOE, and DALLINGER, Judges

DALLINGER, Judge: These are suits against .the United States, arising at the port of New York, brought to recover certain customs duties alleged to have been improperly exacted on particular importations described in the invoices as "1 MS 111 Echo Sounder Recording Installation complete with all accessories No. 1466." Duty was levied thereon at the rate of $4.50 each plus 65 per centum ad valorem under paragraph 368 of the Tariff Act of 1930 as a recording instrument of the kind therein made dutiable at that rate. It is claimed that said article is properly dutiable at the rate of 27½ per centum ad valorem under paragraph 372 of said act as a machine not specially provided for, or, alternatively, at the rate of 40 per centum ad valorem under paragraph 360 of said act as a surveying instrument.

At the first hearing held at New York City on January 10, 1938, the plaintiff offered in evidence the testimony of Morris Fred Ketay, chief engineer of the Bendix Marine Products Co. He testified that he was familiar with the instrument constituting the imported merchandise at bar. A diagram of said instrument was then admitted in evidence as Illustrative Exhibit A, and page 1 of a catalog issued by Henry Hughes & Son, Ltd., the manufacturer of said instrument, showing a photograph of the recording part of said instrument, was admitted in evidence as Illustrative Exhibit B.

The witness then testified that he had observed the installation of a similar instrument on the steamship *Queen Mary*, and also on the steamship *Angol*. Using Illustrative Exhibit A to assist him, the witness then described the operation of the instrument or apparatus at bar as follows:

You have a motor which has a rate of one-thirtieth horsepower. * * * That is driven by direct current at 115 volts. The speed is greater than the speed which we normally require so we have reduction gears to cut the output speed to the recorder. In order to keep the speed of the motor constant within a range of accuracy on the instrument which is approximately five percent, we have a governor on the outside of the gear box.

. *         *         *         *         *         *         *

That is "O." * * * The motor, itself, does not have constant-speed characteristics. That is, it can go at any speed within 200 r. p. m., the rate of speed depending on the shaft of the motor, itself, and the friction in the bearings. In order to keep it at constant speed, we put the governor on, which acts on the balls and spreads them out or expands them and breaks a circuit if the motor goes beyond the speed necessary. The speed at which this motor is set is lower than the normal operating speed of the motor, but everytime the motor drops below that speed the circuit is closed by the governor, and the motor again picks up. So you have the motor running at a constant speed that may be 50 r. p. m., or whatever .it is, depending upon the normal operating speed of the motor.

*         *         *         *  ·      *         *         *

The power is transmitted from the reduction box, "B," through the drum shaft, "C," to the gear, this gear, to the drum "B."

\* \* \* and the drum "E," rotates.

\* \* \* \* \* \* \*

\* \* \* the drum "E," has a cam surface machined in it. As the drum, "E," rotates this cam surface pulls a pen up and back, gives a pen a reciprocal motion across the extremes of the drum

\* \* \* The drum, "E", rotates at 90 r. p. m.

\* \* \* In addition to rotating the drum, "E", this drum shaft, "C", proceeds down and drives the recording paper through another drum down at the lower end, \* \* \* marked "N."

\* \* \* It (the record paper) \* \* \* is sensitized paper, sensitized to electric current. \* \* \* the stylus attached to the drum, "E". That is an electrical stylus. The pen rolls or slides over the chemically treated paper, but the stylus only marks the paper when an electrical impulse is transmitted to the stylus.

At this point a sample of the recording paper was admitted in evidence as Illustrative Exhibit C.

The witness then proceeded to testify as follows:

By Mr. McDonald:

Q. Now, will you please proceed to describe what function the power transmitted from the electrical motor to the shaft, "C", performs for revolving the drum, "N", carrying the sensitized paper?—A. First, the pen travels up and back along the paper, and the instant that the pen has reached the extreme left position this contact, which is designated as S–1, is closed. That closes the circuit to a power release which is not shown on this sketch, a sound-signalling mechanism fastened to the bottom of the boat. This mechanism generates sound which is supersonic and cannot be heard by the human ear. It is transmitted at the rate of 18,000 cycles a second. That sound travels down through the water until it hits a solid weight and it is then reflected back again to another mechanism similar to the transmitting mechanism.

Judge Dallinger. On another boat?

The Witness. On the same boat.

You have two mechanisms exactly alike; one acts as a transmitter and the other acts as a receiver of the sound energy. When the sound energy is received, it is converted by the receiver into manufactured electrical energy. That electrical energy is fed into a power amplifier, in a vacuum power amplifier, which increases the electrical energy, and it is fed back to this pen. If you will recall, I said that the pen travels to the extreme left position, and the second action happens when this pen is right at that edge of the paper. That is the contact, and with this contact you have the second action with the sound going down and coming up. All the time the pen is moving away from that edge. The time it takes for the sound to go down to the solid floor of the river or harbor, and the time coming up again is amplified and put on the stylus. At that time, there is a mark put on the paper. So that the stylus may be put here, some certain distance away from the electrical discharge, and you get the data on the paper.

\* \* \* \* \* \* \*

Q. What does the length of the mark on the sensitized paper indicate?—A. It indicates the depth of the river or the ocean floor from the surface of the water.

Q. Do you know what the purpose of this apparatus is; what it is used for? Yes or no.—A. I do.

\* \* \* \* \* \* \*

Q. Will you tell the court for what purpose this apparatus is used?—

Judge DALLINGER. Have you seen it used?

The WITNESS. I have seen it used.

A. To determine the depth of the ocean floor as it checks up against hydrographic maps.

*       *       *       *       *       *       *

Q. Is this apparatus used for making hydrographic maps?—A. It is.

Mr. WEIL. That is objected to.

Judge DALLINGER. How does he know that?

By Mr. McDONALD:

Q. Have you seen hydrographic maps prepared with the use of this apparatus?—A. No; I have not.

At this point a hydrographic chart of New York harbor, prepared by the United States Coast and Geodetic Survey, showing the depth in feet of the water in said harbor at various points, was marked in evidence "Illustrative Exhibit D for Identification."

The witness then finished his direct testimony as follows:

By Mr. McDONALD:

Q. Have you seen this apparatus used for any purpose other than checking on the accuracy of hydrographic maps?—A. I have not.

On cross-examination the witness testified in part as follows:

X Q. What is the range of this particular type of instrument?—A. Ninety fathoms is the range, with the possiblity of phasing up to 150 fathoms.   *   *   *

*       *       *       *       *       *       *

X Q. Do you know why it is listed as having a range of 25 fathoms in 4 phases of 50 fathoms,   *   *   *—A. I don't think that paper is right.

*       *       *       *       *       *       *

X Q. Now, this particular instrument; it records the depth of the ocean, doesn't it?—A. That's right.

X Q. And that is the distance from the bed of the ocean to the surface?—A. That's right.

*       *       *       *       *       *       *

X Q. Do you know of any instrument which has a range of 3,000 fathoms?—A. That's right.

X Q. They are used by the United States Coast and Geodetic Survey; is that correct?—A. That's correct.

X Q. I mean for a general survey. An apparatus with a limitation of 250 fathoms would not make an adequate machine or instrument for a complete survey, would it?—A. It depends on what you call complete.

X Q. There are depths of the ocean that are greater than 250 fathoms, are there not?—A. Oh, yes.

X Q. There are depths up to 3,000 fathoms?—A. Yes.

*       *       *       *       *       *       *

X Q. The type MS III, which is the type of merchandise which was imported in this case, has a range of 250 fathoms?—A. That's right, 240.

On redirect examination the witness testified as follows:

R. Q. Mr. Ketay, does the apparatus have any other function than measuring the distance from the surface of the water to the bottom of the ocean?—A. It also gives you the character of the surface.

The attention of the witness having been called to Illustrative Exhibit C, and having been requested by his counsel to mark a third time at the top with the letter "C," the witness then testified as follows:

R. Q. What does the line, "C," indicate?—A. That line, "C," indicates that at the point where line "B" is shown the surface of the soil is mud. Right under it is solid rock. You get a double indication when you have mud first and the solid rock underneath. The different lines show the difference between the mud and the solid rock underneath.

R. Q. If a ship was passing over a sunken vessel, such as the *Lusitania*, would it be indicated on the map here?—A. It would.

On recross-examination the witness testified as follows:

R. X Q. Did you ever see the patent of Henry Hughes & Son, Limited, for this instrument?—A. I have.

At this point counsel for the Government offered in evidence a copy of the letters patent setting forth in detail the specifications of the instrument at bar, which document was admitted in evidence as Illustrative Exhibit E.

Apparently there is nothing in Illustrative Exhibit E referring to the use of the invention for the purpose of making hydrographic surveys. In the last paragraph on page 14, the purpose of the patented instrument is described as follows:

(17) Apparatus for the measurement of distances by echo reception substantially as described with reference to the accompanying drawings.

At the second and last hearing held in New York City on November 14, 1938, counsel for the plaintiff offered in evidence the deposition of Cyril Beadnell Potts, sworn to in Ottawa, Canada, on April 11, 1938, which was admitted in evidence as Exhibit 1, and a deposition by the same person sworn to at the same place on June 10, 1938, which was admitted in evidence as Exhibit 2. The case was then submitted by both parties.

In these depositions the affiant, Potts, stated that he has been employed for the past 7 years as manager of the marine sales division of the Ontario Hughes-Owens Co., Ltd.; that he holds a certificate as master mariner issued by the Department of Transport of the Canadian Government; that echo sounding has taken the place of the old-fashioned sounding by lead and line in determining the depth of the ocean; that he had seen the new method of echo sounding used on all classes of vessels and had personally used said method himself; that the new method resulted in greater accuracy and infinitely greater speed; that he had seen this method used by Canadian hydrographic surveyors in the Gulf of St. Lawrence, Grand Banks, Sable Island, Newfoundland, and on the British Columbia coast from 1928 to 1938; that he was familiar with the echo-sounding device manufactured by Henry Hughes & Son, Ltd., of London, England, by

using the same in ordinary navigation of vessels; that he had personally used or had seen used the echo-sounding device for making hydrographic charts in Canada at the places already mentioned by him between 1928 and 1938; that he was familiar with the type of sounding device manufactured by Henry Hughes & Son, Ltd., known as the MS 111 echo-sounder recording installation complete with all accessories No. 1466; that the said device operates on the same principle as the other echo-sounding devices manufactured by the same firm; and that several times a year for the past 7 years he had seen an echo-sounding device known as MS 111 Echo Sounder recording installation complete with all accessories No. 1466, manufactured by Henry Hughes & Son, Ltd., used in the making of hydrographic surveys in the Department of Mines and Resources of the Canadian Government.

Upon this record counsel for the plaintiff in their carefully prepared and exhaustive brief filed herein contend that the device or apparatus constituting the imported merchandise at bar is a surveying instrument within the meaning of paragraph 360 of the Tariff Act of 1930.

On page 10 of said brief counsel state:

It would seem that the plaintiff has clearly, conclusively, and without contradiction established that the imported device is one used to prepare and to check Hydrographic charts and is an essential instrument used in Hydrographic surveying.

While it is true that there is evidence that the imported device is used to check hydrographic charts, or rather used on vessels to make soundings in connection with hydrographic charts, the only proof that a similar device has ever been used in hydrographic surveys preparatory to making hydrographic charts is the statement in the deposition of C. B. Potts, manager of the Canadian exporting company that he had seen it used for that purpose in certain Canadian waters.

But it is well established in customs law that proof of use in a foreign country is not necessarily to be considered as evidence upon which may be based the tariff classification of imported merchandise. In *H. Boker & Co. (Inc.)* v. *United States*, 19 C. C. P. A. 27, T. D. 44870, the appellate court said:

The use which has been made of these articles of importation in foreign countries is no guide to their classification here. We had a somewhat similar case before us in *Taylor* v. *United States*, 3 Ct. Cust. Appls. 498, T. D. 33162, in which we were considering an importation claimed to be entitled to free entry under paragraph 581 of the Tariff Act of August 5, 1909, as "substances used only for manure." We there commented upon the fact that while in England, the country of exportation, the material imported was not considered as suitable for feeding livestock, in this country the opposite condition was true, *and the classification of the material was to be governed by its use in this country. This must be the law. Our tariff laws are made having consideration for the conditions in this country and not those in foreign ones.* [Italics ours.]

It is uncontradicted that the present echo-sounding device is a "mechanism, device, or instrument, intended or suitable for measuring * * * distance," the distance in this case being from the bottom of the ocean to the surface thereof. Hence, the collector's classification must stand unless the plaintiff establishes that the chief use of the instrument is for surveying, which, in our opinion, the record falls far short of proving. There is no evidence in the record that this particular kind of device has ever been used by the United States Coast and Geodetic Survey or by anyone else in the preparation of hydrographic charts.

Upon the established facts and the law applicable thereto we hold that the present echo-sounding device is not a surveying instrument within the meaning of paragraph 360 of the Tariff Act of 1930, but that it is a mechanism, device, or instrument intended for measuring distance within the meaning of paragraph 368 of said act, and as such was properly classified by the collector. All claims are therefore overruled and the decision of the collector is affirmed. Judgment will be rendered accordingly.