**No. 61199.**—Clayton Chemical & Packaging Company *v.* United States, protests 231869–K/5459, 231870–K/5460, and 231874–K/5605 (Chicago).

WILSON, Judge: The merchandise involved, which is known by the trade name "Phenidone," was classified by the collector at the rate of 45 per centum ad valorem, plus 7 cents per pound, under paragraph 28 (a) of the Tariff Act of 1930 as "photographic chemicals" of coal-tar origin. Plaintiff, in its protests, claims that the material in question is properly classifiable under paragraph 5 of the act at the rate of 25 per centum ad valorem as a chemical compound, not specially provided for, and, alternatively, that the importation, if not properly classifiable under paragraph 5, should be assessed under the provisions of paragraph 27 of the act at the rate of 40 per centum ad valorem and 7 cents per pound as a coal-tar product, although the alternative claim is not included in the protests, and plaintiff's counsel argues against this alternative classification in his brief. The provisions of the statutes involved, insofar as applicable to this case, read as follows:

Paragraph 28 (a), Tariff Act of 1930:

PAR. 28. Coal-tar products:
(a) * * * photographic chemicals; * * * all the foregoing products provided for in this paragraph, when obtained, derived, or manufactured in whole or in part from any of the products provided for in paragraph 27 or 1651; * * * 45 per centum ad valorem and 7 cents per pound.

Paragraph 5, Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T. D. 52739:

All chemical elements, all chemical salts and compounds * * * all the foregoing obtained naturally or artificially and not specially provided for _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 12½% ad val.

Paragraph 27, Tariff Act of 1930:

PAR. 27. Coal-tar products:
(a) (1) * * * phenylhydrazine * * * all the foregoing products in this paragraph whether obtained, derived, or manufactured from coal tar or other source;

*     *     *     *     *     *     *

(3) all products * * * which are similar to any of the products provided for in this paragraph or in paragraph 1651, and which are obtained, derived, or manufactured in whole or in part from any of the products provided for in this paragraph or in paragraph 1651;

*     *     *     *     *     *     *

(5) all the foregoing products provided for in this paragraph, not * * * photographic chemicals * * * and not specially provided for in paragraph 28 or 1651, 40 per centum ad valorem and 7 cents per pound.

The deposition of Dr. J. D. Kendall of Ilford, Essex, England, was read into the record. From the deposition, it appears that Dr. Kendall holds a Ph. D. degree from the University of London. At the time he gave his testimony, he was employed by Ilford, Ltd., Ilford, England, the exporter of the merchandise under consideration. The essential portions of Dr. Kendall's testimony may be

summarized as follows: Ilford, Ltd., the witness' employer, was, at the time in question, engaged in the business of manufacturing sensitized photographic materials and was the producer of the imported merchandise, of which Dr. Kendall is the inventor and upon which he holds a patent; this product is known commercially as "Phenidone" and is used as a "photographic developer"; this substance is a distinct chemical compound. He stated as his opinion that the substance is not a coal-tar product; that it was manufactured by reacting phenylhydrazine with acrylonitrile "by heating with a solution of sodium in anhydrous ethyl alcohol," resulting in a compound known as 1-phenyl-3-aminopyrazoline; that this latter product was heated with "a dilute aqueous sulphuric acid solution" which gave the end product, "Phenidone," or 1-phenyl-3-pyrazolidone. The substance thus produced, "Phenidone," is characterized by Dr. Kendall as "a new photographic developer which is very effective in combination with other compounds in the preparation of the photographic developing solutions."

Dr. George Steans, called to testify on behalf of the importer, holds a Ph. D. in chemistry from the University of Berlin, Germany. He has had extensive experience in the field of teaching and in applied chemistry. He became the chief chemist of the F. R. Corp. in New York in 1943. This company "manufactures photographic solutions, developing and fixing solutions, in solid as well as liquid form." From 1950 to 1954, he was in charge of the chemical activities of this company. In the latter year, he entered the employ of the plaintiff corporation, where, at the time he testified, he was engaged in work similar to that which he performed for the F. R. Corp. After testifying concerning his qualifications and the nature of his employment, Dr. Steans testified in substance (R. 30–37) as follows: That, for some time, he has been familiar with chemistry as it relates to photography, particularly in the field which deals with developing agents; that he has been familiar with the substance, known as "Phenidone," since about 1952. He gave the chemical name of the material as 1-phenyl-3-pyrazolidone which, he stated, is not a chemical solution or a chemical mixture but a chemical compound. He further stated that phenylhydrazine is one of the materials used in the manufacture of "Phenidone" and that phenylhydrazine could be connected with coal tar, but does not have to be. The witness, under cross-examination, however, admitted that both phenylhydrazine and "Phenidone" contain the benzene ring. Dr. Steans was not asked whether "Phenidone" is or is not a photographic chemical, as classified. His testimony evidently was intended to show that the imported merchandise is not a coal-tar product.

Clayton Rautbord, president of the plaintiff corporation, testified that his company purchased the imported "Phenidone" from Ilford, Ltd., in England; that his company has imported that material for a number of years and was originally the exclusive importer of the substance from England into this country; that the material is used mostly in "photostatic developing solutions" and "We used it in the manufacture of developing solutions for photostatic processes, and that is what it is used for today, about 90 per cent of the material which is used"; and that the "Phenidone" imported by his company was not sold in the form in which imported but "was put into a solution with several other compounds, both organic and inorganic." The witness, while claiming that the great bulk of the imported "Phenidone" is used in photostatic solutions, stated that it is also used "in other photographic developing solutions, such as for pictures, and for X-rays, and to some extent for film negatives" (R. 52). The witness further stated that, of the "Phenidone" manufactured in the United States, the plaintiff corporation uses about 80 per centum, and, of that 80 per centum, about 90 per centum is used by photostating equipment companies, leaving approximately "30 per cent or so of the total amount of Phenidone to be used for other purposes." He further testified that about 90 per centum of all "Phenidone" used in the United States

"is used in machines and made for photostating equipment." The witness identified defendant's exhibit C as a form letter, sent out by the plaintiff corporation to advertise "Phenidone." Among other things, defendant's exhibit C states:

Imagine, developers now being produced with Phenidone give the user up to 75% increase in paper or film area developed. * * * All this can be accomplished without the possibility of rash or stain to the photographers skins.

Regardless of what your application for photographic developer is, send details about its use. You will promptly receive a formula incorporating Phenidone. Better yet, if you have a formula which you are mixing, (x-ray, photocopy, fine grain work, plates, movie films, etc.) send us a copy and we will make the necessary changes giving you complete details and instructions for its use.

On the basis of the record, the plaintiff contends that "Phenidone" is not a photographic chemical, as classified, because it is used principally to produce photostats or photostatic chemicals and not as a photographic chemical. The plaintiff cites a large number of cases intended to show that, if the merchandise in question is to be classified as a photographic chemical, it must be upon the theory that it is used as a photographic chemical, asserting that imported merchandise must be classified according "to the use to which it or similar merchandise is usually, practically, and generally put in the United States, and incidental or occasional use does not control classification." In support of this position, counsel for the importer, in his brief, cites *Magone* v. *Heller*, 150 U. S. 70; *Richardson Co.* v. *United States*, 8 Ct. Cust. Appls. 179, T. D. 37289; *Merck & Co.* v. *United States*, 6 Ct. Cust. Appls. 32, T. D. 35274; *Magone* v. *Wiederer*, 159 U. S. 555; *United States* v. *Hempstead & Son*, 3 Ct. Cust. Appls. 436, T. D. 33004; *Vandiver* v. *United States*, 1 Ct. Cust. Appls. 194, T. D. 31219; *United States* v. *Horrax*, 1 Ct. Cust. Appls. 142, T. D. 31187; *Taylor et al.* v. *United States*, 3 Ct. Cust. Appls. 498, T. D. 33162; *Keller Co. et al.* v. *United States*, 13 Ct. Cust. Appls. 428, T. D. 41343; and *Sheldon & Co.* v. *United States*, 2 Ct. Cust. Appls. 439, T. D. 32199. However, for the reasons hereinafter set forth, the court does not consider these cases to be controlling or to have any weight in determining the proper classification of the material now under consideration.

Upon the assumption that "Phenidone" is used chiefly in manufacturing solutions to produce photostats and that the process known as photostating should be differentiated from the field of photography, plaintiff's counsel cites the case of *Ozalid Corporation* v. *United States*, 71 Treas. Dec. 777, T. D. 48969, decided by the Customs Court in 1937, as controlling in the instant case. The merchandise there in question was classified, as was the commodity here in issue, under paragraph 28 of the Tariff Act of 1930 as "photographic chemicals" and claimed properly classifiable under paragraph 5 as "chemical compounds," or, alternatively, under paragraph 27 of the act as a coal-tar intermediate. The *Ozalid* case, *supra*, however, in our opinion, is clearly distinguishable from the case now before us. In the *Ozalid* case, *supra*, a chemical analysis showed the material before the court to consist of—

* * * Aluminum sulphate, boric acid and paraamidodimethylanilin diazo compound, the latter a coal-tar intermediate used in the manufacture of dyestuffs and the other article * * * is composed of aluminum sulphate, thiourea, methylphenylpyrazolon, and the sodium salt of naphthalintrisulfonic acid, the two latter being coal-tar intermediates, one used in the manufacture of dyestuffs, and the other as a wetting agent.

The evidence also shows that they are not used in photography and are not photographic chemicals, but are used to make sensitizing or coating paper on a coating machine which is identical in principle with the machines used in coating blue-print paper. This is totally unlike photography, but instead is similar to what we call blue printing and an improvement thereof. None of the usual materials used in photography is used, such as silver compounds, gelatin, or a camera or a lens. This positive production paper *is not sold for any photographic process.* [Italics ours.]

The court, in the *Ozalid Corporation* case, *supra*, found that the imported articles were not photographic chemicals and further found that the coal-tar intermediates contained in the involved articles, as disclosed in the analysis of the merchandise there under consideration, were not covered in terms by paragraph 27. Accordingly, the court held that, as the articles in question were composed entirely of chemical compounds, they were properly classifiable as a mixture of chemical compounds under paragraph 5 of the tariff act.

There is nothing in the present record that would justify the conclusion that the "photographic developer" under consideration is not sold for any photographic process. On the contrary, the inventor of "Phenidone" characterizes it as "a new photographic developer which is very effective in combination with other compounds in the preparation of the photographic developing solutions." The only other expert witness, Dr. Steans, did not testify concerning photostatic materials, but stated his experience had been in the field of manufacturing "photographic solutions, developing and fixing solutions." In the *Ozalid Corporation* case, *supra*, there is nothing whatever in the record to indicate that a developing solution used in the photographic processes was involved.

In the record now before us, we find no evidence at all which indicates that chemicals and solutions used in the photostating process differ in any way from the agents used in the ordinary field of photography. Nor is there anything in the record to indicate that the developing solution, known as Apeco one-step concentrate, sold to the American Photocopy Equipment Co., the plaintiff's sole customer, in any way differs from developing solutions used in the general field of photography.

Paragraph 28 (a) of the Tariff Act of 1930 provides, in part, for "photographic chemicals * * * when obtained, derived, or manufactured in whole or in part from any of the products provided for in paragraph 27 * * *." The record in the case at bar establishes that "Phenidone," the imported product, is manufactured from phenylhydrazine (R. 19, 22, 31). Phenylhydrazine, "whether obtained, derived, or manufactured from coal tar or other source," is provided for in paragraph 27 (a) (1) of the tariff act. Accordingly, the imported product meets the source requirement for classification under paragraph 28 (a). (*United States* v. *Esso Standard Oil Co.*, 41 C. C. P. A. (Customs) 171, C. A. D. 546.)

It is, of course, an elementary principle in customs law, requiring the citation of no authorities, that an importer challenging the classification of merchandise as made by the collector has the twofold burden of showing the incorrectness of the classification and of establishing the correctness of the classification for which he contends. We are of the opinion that plaintiff has clearly failed in discharging this burden.

In view of this situation, it is unnecessary to consider further the cases cited by plaintiff or to discuss the question of whether the "Phenidone" under consideration is or is not a coal-tar product. We, therefore, find that the classification and assessment as made by the collector should stand and that the protests should be overruled. Let judgment be entered accordingly.